PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 13-1615 & 13-1780
_____

VICI RACING, LLC
                    Appellant in 13-1780
                v.

T-MOBILE USA, INC.,
                    Appellant in 13-1615
_____

Appeal from the United States District Court
for the District of Delaware
(D.C. Civ. Action No. 1-10-cv-835)
District Judge: Honorable Sue L. Robinson
_____

Argued January 14, 2014

Before: AMBRO, GREENAWAY JR., *Circuit Judges*,
and BAYLSON[*], *District Judge*

(Opinion Filed: August 13, 2014)

_____

    [*] Honorable Michael M. Baylson, United States
District Court for the Eastern District of Pennsylvania, sitting
by designation.

John D. Lowery, Esquire
Gavin W. Skok, Esquire
1001 Fourth Avenue
Seattle, WA 98154

James C. Martin, Esquire    (Argued)
Colin E. Wrabley, Esquire
225 Fifth Avenue
Pittsburgh, PA 15222

Peter J. Walsh, Jr., Esquire
Jennifer C. Wasson, Esquire
1313 North Market Street
6th Floor, P.O. Box 951
Wilmington, DE 19801

        Counsel for Appellant in 13-1615
        (Cross Appellee in 13-1780)

Juan C. Antorcha, Esquire
Joseph P. Klock, Jr., Esquire  (Argued)
283 Catalonia Avenue
Coral Gables, FL 33134

Christopher D. Loizides, Esquire
1225 King Street
Wilmington, DE 19801

        Counsel for Appellee in 13-1615
        (Cross Appellant in 13-1780)

———————————

OPINION OF THE COURT

———————————

Baylson, *District Judge*

## I.    Introduction

This appeal arises out of a contract dispute between VICI Racing LLC ("VICI"), the owner of a sports car racing team, and T-Mobile USA, Inc. ("T-Mobile"), a telecommunications company that agreed to be a corporate sponsor of the sports car team.  Appellant/Cross-Appellee T-Mobile appeals a $7 million judgment entered against it in the District Court for the District of Delaware.  After a bench trial, the District Court ruled that T-Mobile breached a contract with Appellee/Cross-Appellant VICI and awarded VICI $7 million in damages.  On appeal, T-Mobile argues that it should not have been held liable for any damages arising out of the contract and is instead entitled to damages. VICI filed a cross-appeal, seeking an additional $7 million pursuant to what it contends is a liquidated damages clause in the contract.

## II.    Background

VICI is the former operator of a sports car racing team that competed in the American Le Mans Series.[1]  *VICI Racing, LLC v. T-Mobile USA, Inc.*, 921 F. Supp. 2d 317, 320 (D. Del. 2013).  T-Mobile owns and operates a wireless

—————————

[1]  The American Le Mans Series is a series of sports car races that is sanctioned by the International Motor Sports Association.  J.A. 887.

telephone service including automobile-based wireless telephone service.  J.A. 887.

Beginning in March 2009, VICI President Ron Meixner entered into discussions with T-Mobile executives about sponsoring the VICI team for the 2009, 2010, and 2011 Le Mans racing seasons.  *VICI Racing*, 921 F. Supp. 2d at 320.  Meixner informed T-Mobile that a "sponsorship would be economically valuable for T-Mobile because VICI could offer T-Mobile to be the network service provider for the VW/Audi Group and Porsche AG Telematics services."  *Id.* (internal quotation marks and citation omitted).[2]  A number of discussions were held within T-Mobile about the financial opportunities associated with providing telematics services to VW, Audi, and Porsche, as well as how the Agreement with VICI would secure that business.  *See id.* at 321-22.

---

[2]  The District Court did not make any findings about the meaning of the term "telematics" nor did the contract define the term.  We note that it has been defined as "[t]he branch of science concerned with the use of technological devices to transmit information over long distances," *Collins English Dictionary* (10th ed. 2009), *available at* http://dictionary.reference.com/browse/telematics, and as "refer[ring] to the broad industry related to using computers in concert with telecommunications systems.  This includes dial-up service to the Internet as well as all types of networks that rely on a telecommunications system to transport data.  The term has evolved to refer to systems used in automobiles that combine wireless communication with GPS tracking.  The term is further evolving to include a wide range of telecommunication functions that originate or end inside automobiles," *Telematics*, WEBOPEDIA, http://www.webopedia.com/TERM/T/telematics.html.

## A.    The Agreement

On March 30, 2009, T-Mobile and VICI entered into a Sponsorship Agreement (the "Agreement").  J.A. 894.  The Recitals section of the Agreement states that T-Mobile agrees to sponsor VICI and that VICI and T-Mobile "desire to promote and maintain their respective corporate images and reputations through participation in the 2009, 2010 and 2011 American LeMans race seasons."  *Id.* at 887.  The Agreement required VICI to field one T-Mobile-sponsored Porsche racecar during the 2009 season and two T-Mobile-sponsored Porsche racecars during each of the 2010 and 2011 seasons. *Id.* at 887.  The Agreement also required VICI to display T-Mobile's logo and trademark on its racecars, trailers, uniforms, and other promotional items.  *Id.* at 888-89.

Additionally, section 5.8 of the Agreement provides that "VICI grants to [T-Mobile] the right to be the exclusive wireless carrier supplying wireless connectivity for the Porsche, Audi and VW telematics programs beginning in model year 2011 with such exclusivity continuing throughout the Term of this Agreement."  *Id.* at 888.  The meaning and relevance of section 5.8 were a hotly disputed issue at trial.

As for T-Mobile, section 4 of the Agreement required it to make the following payments to VICI:

> 2009 Race Season: $1,000,000.00 payable by April 1, 2009;[3]
>
> 2010 Race Season: $7,000,000.00 payable by January 1, 2010; and

---

[3]  This amount was timely paid by T-Mobile to VICI and is not in dispute.

5

>> 2011 Race Season: $7,000,000.00 payable by January 1, 2011.

*Id.* at 887-88.

The Agreement also contains three other provisions that are relevant to this appeal. Section 13.2 of the Agreement is a force majeure clause. According to that provision,

> [i]f a party's performance of any non-monetary obligation under this Agreement is prevented by any condition wholly beyond such party's control, the affected party will be excused from such performance, provided the affected party: (a) provides prompt written notice of such interference, the nature of such interference and the expected duration of such interference to the other party; and (b) resumes performing its obligations hereunder promptly following the removal of such interfering condition. The other party will be relieved from performing its obligations under this Agreement for the duration of such interference. Such delay or failure shall not constitute a breach of this Agreement . . . .

*Id.* at 893.

Section 14.7 of the Agreement is a severability clause, which provides

> [t]he provisions of this Agreement are severable and, if any one or more provisions are determined to be illegal or otherwise unenforceable, in whole or in part, the

remaining provisions, and pay partially enforceable provisions to the extent enforceable, shall nevertheless be binding and enforceable, and such illegal or otherwise unenforceable provisions shall be replace[d] by such valid provisions which come closest to the purpose and intent of this Agreement

*Id.* at 893.

Finally, section 11 of the Agreement has a provision under the heading "Limitation of Liabilities." Section 11.2 of that provision provides in all capital letters

[t]he maximum aggregate liability of either party and any of its affiliates to the other party, and the exclusive remedy available in connection with this agreement for any and all damages, injury, losses arising from any and all claims and/or causes of action, shall be limited to $20,000 or the aggregate payments payable under this agreement, whichever is higher . . . .

*Id.* at 892 (some capitalization omitted).

## B. The "Telematics" Collaboration

As the District Court's findings of fact detail, beginning in April 2009, Meixner worked with T-Mobile to secure "telematics" business from VW, Audi, and Porsche. For example, Meixner helped set up meetings for T-Mobile with the President and CEO of Porsche Motorsports North America, provided the contact information of fifteen "key people in telematics" at VW, *VICI Racing*, 921 F. Supp. 2d at 325 (citation omitted), and helped pitch T-Mobile's services at a meeting with VW. *Id.* at 324-26. T-Mobile, however,

complained that things were "moving a little slower than [it] would like." *Id*. at 325 (citation omitted).

### C. The Accident

On July 18, 2009, T-Mobile's sponsored racecar sustained engine and body damage from an accident while racing. *Id.* On August 2, 2009, Meixner sent a letter to T-Mobile's President and legal department notifying them about the accident. In the letter, Meixner stated that the racecar would not be able to race for 45 to 60 days while it was undergoing repairs. A T-Mobile executive responded by expressing his displeasure that the repairs would mean guests of T-Mobile would not see the T-Mobile racecar compete in an upcoming race. *Id.*

### D. Termination of the Agreement

On January 5, 2010, Meixner sent T-Mobile a notice of default, indicating that T-Mobile had failed to pay the $7 million due under the Agreement by January 1, 2010. *Id.* at 327. On January 7, 2010, T-Mobile sent a letter to Meixner terminating the Agreement, claiming that VICI materially breached the contract because

> VICI made a material representation and warranty (Section 5.8) that VICI had the authority to bind Audi, VW and Porsche . . . to an obligation making [T-Mobile] the exclusive wireless carrier supplying wireless connectivity for the . . . telematics programs beginning in model year 2011. As it turns out . . . VICI does not have and has never had the authority to grant such rights . . . or to contractually bind Audi and VW in that regard. . . . VICI has not

provided any other real support to T-Mobile to assist us in meeting that objective.

In addition, we note that VICI failed, without justification or prior notice to [T-Mobile], to race . . . at one key event where [T-Mobile] was present with business guests.

*Id.* (alterations in original).

### E.  Proceedings in the District Court

On September 30, 2010, VICI filed suit in the District of Delaware against T-Mobile, claiming that T-Mobile breached the Agreement when it failed to pay VICI $7 million on January 1, 2010 and seeking $14 million in damages.  T-Mobile asserted, as an affirmative defense and counterclaim, that VICI did not perform its obligations under the contract (1) by failing to race during the period the T-Mobile-sponsored car was damaged and (2) by failing to provide T-Mobile with telematics business to three automakers.  T-Mobile also alleged fraudulent inducement and equitable fraud against VICI.

Prior to trial, the parties filed a "joint proposed pretrial order."  This document is divided into several sections where each party listed its own statement of disputed facts, disputed issues of law, and a statement of what the parties intended to prove.  *Id.* at 78.

At the bench trial, VICI's evidence and contentions on damages were exclusively dedicated to the argument that section 11.2 was a liquidated damages clause that fixed the amount of damages at $14 million.  T-Mobile did not contest VICI's characterization of section 11.2.  It also did not assert as an affirmative defense, nor argue at trial, that VICI failed

9

to mitigate its damages. Rather, T-Mobile relied on the argument that section 5.8 (the telematics provision) was an essential term of the Agreement—that is, if section 5.8 was found to be unenforceable, then the entire Agreement would be unenforceable. Because the Agreement would be unenforceable without section 5.8, T-Mobile argued that this conclusion required the District Court to award it damages in quantum meruit. T-Mobile also argued that it had been fraudulently induced into entering the Agreement by VICI's representation that it had the authority to secure telematics business from VW, Audi, and Porsche.[4]

On February 11, 2013, the District Court entered judgment in favor of VICI. In a comprehensive opinion accompanying its judgment, the District Court made detailed findings of fact and conclusions of law. It determined that T-Mobile breached the Agreement by failing to make the obligatory payment of $7 million on January 1, 2010. *VICI Racing*, 921 F. Supp. 2d at 334. It also concluded that section 5.8 was ambiguous on its face and that parol evidence did not resolve the ambiguity. *Id.* at 328-29. According to the District Court's findings of fact, before the final Agreement was signed, Robert Hines, T-Mobile's inside counsel, spoke with Meixner about section 5.8. According to Meixner's testimony, during that conversation the T-Mobile official explained that section 5.8 only meant "that T-Mobile is exclusive to [VICI] and that [VICI] cannot shop this around and get—promote any other wireless carriers, and that was it."[5] *Id.* at 324. The District Court reached clear findings that

---

[4] The District Court rejected T-Mobile's fraudulent inducement argument. T-Mobile does not appeal that ruling.

[5] The quoted testimony is arguably contrary to T-Mobile's arguments in this litigation. There was clearly

the language of section 5.8 is "too convoluted to have any one clear meaning," is "fairly susceptible of different interpretations," could "have two or more different meanings," and that "an examination of the rest of the contract reveals no other provisions that in any way illuminate the language contained in section 5.8." *Id.* at 326.

In reaching this finding, the District Court rejected T-Mobile's argument that it only entered the contract because of its understanding of section 5.8. *Id.* at 328. Specifically, the Court concluded that even if it were "to assume the veracity of T-Mobile's subjective understanding [of section 5.8], the evidence of record does not support that this subjective understanding was 'objectively manifested' to VICI or that VICI knew or should have known of it." *Id.* at 331. The Court then severed section 5.8 pursuant to section 14.7 (the severability provision) of the Agreement. *Id.* at 330.

In response to T-Mobile's argument that VICI first breached the contract, the Court concluded that, although VICI did not meet its obligation to race for the entire 2009 season, that failure was excused under the Agreement's force majeure provision (section 13.2) because the racecar had been damaged in an accident and VICI had provided notice to that effect. *Id.* at 332.

With respect to damages, the Court awarded VICI expectation damages of $7 million for T-Mobile's breach of contract. *Id.* at 334. In support of this award, the Court found that VICI had relied upon receipt of the $7 million payment to pay for expenses remaining from the 2009 season and to pay for preparation costs for the 2010 season. *Id.*

conflicting testimony on the intent of the parties as to the contractual language.

Though this issue was not raised by the parties, the District Court also concluded that VICI had a responsibility to mitigate its damages after T-Mobile sent its termination notice by, for example, attempting to find a substitute primary sponsor for the 2010 and 2011 seasons. *Id.* The Court thus refused to award the second $7 million payment to VICI, observing in a footnote that it would not award VICI $14 million pursuant to section 11, which it described as a "quasi liquidated damages provision," because that amount was "unreasonably large" and would constitute an unenforceable "penalty," or "windfall." *Id.* at 334 n.22.

Both parties appealed the District Court's judgment.

## III.   Jurisdiction

VICI's complaint invoked federal diversity jurisdiction under 28 U.S.C. § 1332. Because T-Mobile is a corporation, it is a citizen of its state of incorporation and where it maintains its principal place of business. *Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412, 419 (3d Cir. 2010). T-Mobile was incorporated in Delaware and maintains its principal place of business in the State of Washington. It therefore is a citizen of both Delaware and Washington for diversity purposes. Because VICI is a limited liability company, it is a citizen of any state in which its members are citizens. *Id.* at 418 ("[T]he citizenship of an LLC is determined by the citizenship of its members."). VICI's sole member is Ron Meixner, who is a citizen of Florida. VICI is thus a citizen of Florida for diversity purposes. The amount in controversy is $14 million. Because the parties are diverse and the amount in controversy is over $75,000, we have subject matter jurisdiction over this case. We have appellate jurisdiction under 28 U.S.C. § 1291.

## IV.  Standards of Review

On appeal from a bench trial, our court reviews a district court's findings of fact for clear error and its conclusions of law *de novo*.  *McCutcheon v. Am.'s Servicing Co.*, 560 F.3d 143, 147 (3d Cir. 2009).  For mixed questions of law and fact "we apply the clearly erroneous standard except that the District Court's choice and interpretation of legal precepts remain subject to plenary review."  *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 201 (3d Cir. 2005).  "To the extent that the District Court's conclusions rested on credibility determinations, our review is particularly deferential."  *Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143, 156-57 (3d Cir. 2010) (citing *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985)).  A finding of fact is clearly erroneous when it is "completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data."  *Berg Chilling Sys., Inc. v. Hull Corp.*, 369 F.3d 745, 754 (3d Cir. 2004).

With respect to damages, we review *de novo* "whether the district court applied the appropriate measure of contract damages in a legal sense."  *Id.*

## V.  Liability

### A.  T-Mobile's Contentions

As noted above, the District Court found that section 5.8 of the Agreement was unenforceable and severed the provision.  As an initial matter, we note that T-Mobile does not appeal the District Court's finding that section 5.8 was

ambiguous and, therefore, unenforceable.[6] Rather, T-Mobile appeals only the District Court's decision to sever section 5.8 from the Agreement and to enforce the remainder of the Agreement. T-Mobile argues that the Court erred by severing section 5.8 because it failed to analyze whether section 5.8 was essential to the Agreement as a whole, as required by Delaware law.

Specifically, T-Mobile argues that Delaware law required the District Court to consider whether severance was consistent with the intention of the contracting parties. It claims that the Court did not analyze the parties' intent on whether they would have signed the Agreement without the severability provision, and instead relies solely on the fact that the Agreement included a severability clause. T-Mobile also contends that the presence of the clause in the Agreement may be indicative, but is not conclusive, of the parties' intent with respect to severability. As a result, it argues that the record supports a finding by this Court of reversible error because the record shows that the parties would not have

---

[6] The District Court applied the correct legal principles in reaching its determination that the provision was ambiguous. After determining that the provision was ambiguous on its face, the Court then considered parol evidence to try to ascertain the parties' intentions. This approach is approved by the Supreme Court of Delaware. *See GMG Capital Invs., LLC v. Athenian Venture Partners, I, L.P.*, 36 A.3d 776 (Del. 2012) ("Where a contract is ambiguous, the interpreting court must look beyond the language of the contract to ascertain the parties' intentions." (internal quotation marks omitted)). The District Court, acting as factfinder, considered the relevant parol evidence, but concluded that the extrinsic evidence did not resolve the ambiguity.

14

entered the Agreement without an enforceable telematics provision.

Additionally, T-Mobile points to the second half of the severability provision, which states that, where any provision of section 11 is severed, it "shall be replace[d]" with a provision that "come closest to the purpose and intent of this Agreement." J.A. 893. By not replacing the severed provision with a provision that addressed the same purpose and intent of the severed clause, T-Mobile posits that the District Court erred.

T-Mobile further contends that the Court erred by finding that the force majeure provision of the contract excused VICI's breach by failing to race in several races in 2009 following a crash that damaged VICI's racecar. T-Mobile claims that VICI only relied upon its own economic limitations when insisting that it could not race another car, and also that the District Court erred by not inferring a foreseeability requirement into the force majeure provision. In its pretrial statement, T-Mobile at no time mentioned foreseeability as a required element for implementation of the force majeure clause on the contract. *See id.* 78.

## B. VICI's Contentions

VICI contends that the District Court attempted to interpret section 5.8 according to its plain terms, giving priority to the parties' intentions, but ultimately found the provision to be ambiguous. Continuing with this contention, it argues that the Court then appropriately considered extrinsic evidence, but found that it did not clarify the meaning of the provision.

As part of the evaluation of extrinsic evidence, VICI suggests that the District Court rejected T-Mobile's

15

interpretation of section 5.8 as not credible and found that, even if T-Mobile's interpretation was held in good faith, T-Mobile never conveyed that understanding to VICI such that VICI knew or should have known of it.

VICI also argues that the District Court's decision to sever section 5.8 and enforce the remainder of the Agreement should also be affirmed. It maintains that the District Court properly found that (1) the severability clause of the Agreement showed that the parties clearly intended to enter a severable Agreement, (2) the remainder of the Agreement was enforceable, and (3) the record did not support T-Mobile's characterization of section 5.8 as integral to the Agreement.

Finally, VICI disputes the argument that the District Court ignored the second part of the severability clause, which provided that a severed provision would be replaced with a valid provision that "comes closest to the purpose and intent of this Agreement." J.A. 893. According to VIC, the Court considered and attempted to replace the severed provision, but found that the ambiguity of section 5.8 prevented it from ascertaining section 5.8's relationship to the "purpose and intent of th[e] Agreement." *Id.* 888.

VICI also argues that the District Court properly applied the force majeure provision of the contract to excuse VICI's own breach. In VICI's view, T-Mobile conflates the economic hardship experienced after a force majeure event with the force majeure event itself, as (1) VICI could not have foreseen the damage to the car or the steps that it would need to take to repair that damage, and, in any event, (2) T-Mobile waived all of its appellate arguments on damages.

We review below the parties' contentions on VICI's cross-appeal in which VICI asserts the District Court erred in

refusing to award damages for the full $14 million damages it claimed in this case.

### C. The District Court Did Not Err in Severing Section 5.8 and Enforcing the Remainder of the Contract

Delaware law is clear that "[a]n invalid term of an otherwise valid contract, if severable, will not defeat the contract." *Hildreth v. Castle Dental Ctrs., Inc.*, 939 A.2d 1281, 1283-84 (Del. 2007). Thus, "a court will enforce a contract with an indefinite provision if the provision is not a material or essential term." *Echols v. Pelullo*, 377 F.3d 272, 275 (3d Cir. 2004) (finding a contract could not be enforced due to its failure to specify minimum compensation for performance); *see also Hindes v. Wilmington Poetry Soc'y*, 138 A.2d 501, 503 (Del. Ch. 1958) (declaring contract invalid and noting that while it is true that "material provisions of an agreement can be so indefinite that the agreement will not be enforced," "it is equally true that a court will not upset an agreement where the indefinite provision is not an essential term"). Having decided that section 5.8 was too ambiguous to enforce, the District Court then considered whether the ambiguity of section 5.8 defeated the contract as a whole.

The inquiry turns on the parties' intentions. *Orenstein v. Kahn*, 119 A. 444, 445 (Del. 1922) (noting that whether a contract is severable is a question of the intent of the parties). "Delaware courts recognize that the parties' intent to enter into a divisible contract may be expressed in the contract directly, through a severability clause." *Doe v. Cedars Acad., LLC*, No. 09C-09-136, 2010 WL 5825343, at *4 (Del. Super. Ct. Oct. 27, 2010) (severing provision of contract and enforcing remainder of contract, including forum selection clause) (citations omitted).

If a court finds that the parties intended a contract to be severable, it must then determine whether the remaining terms of the contract are sufficiently definite that the agreement can be enforced, since "[a] contract must be reasonably definite in its terms to be enforceable." *Scarborough v. State*, 945 A.2d 1103, 1112 (Del. 2008) (holding that trial court abused its discretion by refusing to consider terms of oral agreement between parties); *see also Echols v. Pelullo*, 377 F.3d 272, 275 (3d Cir. 2004) ("In Delaware, as in most jurisdictions, a court will not enforce a contract that is indefinite in any of its material and essential provisions."); *Parker-Hannifin Corp. v. Schlegel Elec. Materials, Inc.*, 589 F. Supp. 2d 457, 463 (D. Del. 2008) (granting motion to enforce settlement agreement and explaining that a contract contains all essential terms and is therefore enforceable when "it establishes the heart of the agreement").

The severability clause in the Agreement is clear and reflects the parties' intentions that unenforceable provisions would be severed from the contract and the remaining provisions would be enforced. To repeat, in pertinent part, the Agreement states:

> The provisions of this Agreement are severable and, if any one or more provisions are determined to be . . . unenforceable, . . . the remaining provisions . . . shall nevertheless be binding and enforceable, and such illegal or otherwise unenforceable provisions shall be replace[d] by such valid provisions which come closest to the purpose and intent of this Agreement.

18

J.A. 893. As the District Court recognized, this provision "is a clear manifestation of the parties' intention to create a contract wherein any unenforceable provisions would not destroy the entire agreement." *Id.* at 24. Moreover, the Agreement contained sufficiently definite terms that it could be enforced. *Id.*

T-Mobile argues that the District Court did not determine whether section 5.8 was essential to the Agreement. It is unclear whether T-Mobile argues that section 5.8 is essential as evidence that the parties did not intend for the provision to be severable or to show that, without section 5.8, the Agreement cannot be enforced because it no longer reflects the essential terms of the parties' agreement. Nevertheless, the contention fails.

As for the first contention, the Court clearly found the severability provision to be unambiguous. *VICI Racing*, 921 F. Supp. 2d at 330. As discussed above, we find no error in the Court's conclusion. As for the second contention, that the remaining terms of the contract could not be enforced, we also find no error. Although it did not frame its analysis in those terms, the Court clearly rejected T-Mobile's argument, offered both on appeal and at trial, that it only entered the Agreement to gain telematics business from various automakers. Indeed, the Court concluded that "although T-Mobile has repeatedly asserted that it entered into the sponsorship only to gain the telematics business[,] . . . this intention is not reflected in the four corners of the agreement." *Id.* at 328 (internal quotation marks omitted). In support of this conclusion, "[t]he recitals state the purpose of the contract is to sponsor a[ ] . . . racecar" and that "[t]he sponsorship contract in question is eight pages long and contains over 300 lines of text . . . [in which] the word telematics is used only one time, in a three line provision (section 5.8) *with no indication that this provision was the*

19

*bedrock of the deal for T-Mobile*." *Id.* (emphasis added) (internal citations and quotation marks omitted).[7] Another reason supporting this conclusion is the failure of the parties to define telematics or to include, in the contract, any term stating that the provision of telematics was part of VICI's obligation.

Thus, the District Court properly determined that the parties intended to sever unenforceable contractual terms from the contract and that the telematics provision was not an essential term of the Sponsorship Agreement and properly dealt with the remaining contractual terms.

Nor do we find persuasive T-Mobile's argument that the District Court erred by not replacing the severed provision of section 5.8 with another provision that "comes closest to the purpose and intent of the Agreement" per the severability provision in the Agreement. J.A. 893. In light of the unresolvable ambiguity as to the meaning of section 5.8 and the lack of any discussion of telematics in any other part of the Agreement, the Court could not possibly have conjured another provision that would "come[ ] close to the purpose and nature of the Agreement" with respect to telematics.[8]

---

[7] Although the District Court went on to consider parol evidence to determine the *meaning* of the section, doing so did not contradict or undercut the conclusion that the telematics provision was not essential to the parties' contractual formation.

[8] T-Mobile also argues that the District Court failed to consider the apportionment of consideration—that is, failed to determine whether the contract permitted apportionment of the consideration to certain promises. We reject this

**D.    The District Court Did Not Err in Finding That the Force Majeure Provision Excused VICI's Breach**

Having determined that the District Court properly severed section 5.8 and enforced the remainder of the Agreement, we next turn to the question of whether the Agreement's force majeure provision excused VICI's failure to enter a racecar into several races in 2009.  It determined that the provision did excuse VICI's breach.   T-Mobile contests that conclusion.

A force majeure clause defines an area of events that might excuse nonperformance within the contract period. *Gulf Oil Corp. v. F.E.R.C.*, 706 F.2d 444, 452 (3d Cir. 1983) (citing *United States v. Brooks-Callaway Co.*, 318 U.S. 120, 123-24 (1943)) (holding that a Federal Energy Regulatory Commission order constituted  legal error on force majeure issue and discussing difference in application of force majeure clauses in warranty and non-warranty context).  As the District Court noted, "[a]s a general matter, '[f]orce majeure clauses are . . . drafted to protect a contracting party from the consequences of adverse events beyond that party's control."   *VICI Racing*, 921 F. Supp. 2d at 331 (quoting *Stroud v. Forest Gate Dev. Corp.*, Case Nos. Civ.A.20063-NC and Civ.A.20464-NC,  2004 WL 1087373, at *5 (Del. Ch. May 5, 2004) (unpublished) (rejecting occurrence of force majeure event where real estate developer "encountered problems with groundwater which interfered with construction of the foundation" because "that [] is not what caused [the developer] to miss its contractual performance

---

argument in light of the fact that the Agreement contains a severability provision that reflects the parties' intention to allow certain unenforceable provisions of the contract to be severed without concern for apportionment of consideration.

21

date; it missed that date because it had not previously moved diligently"). [9] As with all contractual interpretation, however, a court must determine the intent of the parties from the contractual language. *Stroud*, 2004 WL 1087373, at *5 n.25.

The District Court found that the car accident constituted a force majeure under the terms of the Agreement, and observed:

> Turning to section 13.2 of the agreement, the force majeure provision at issue may be invoked if three conditions are met: (1) the prevented obligation is a nonmonetary obligation that is prevented by a condition beyond a party's control; (2) the affected party provides prompt notice of the interference, its nature, and expected duration; and (3) performance of the prevented obligation resumes as soon as the interference is removed.
>
> []Turning to the facts, the obligation that was prevented in this case was certainly a non-monetary one; VICI was prevented from racing

---

[9] Unpublished opinions of Delaware courts may be cited in Delaware, although not as binding precedent. *See Oglesby v. Penn Mut. Life Ins. Co.*, 877 F. Supp. 872, 896 n.2 (D. Del. 1994) ("Unpublished orders of the Delaware Supreme Court have precedential effect in Delaware."); Appellate Handbook Comm. of the Del. Supreme Court Rules Advisory Comm., Delaware Appellate Handbook, at 8-vi (1996) ("Under Supr. Ct. R. 17(a), unpublished orders of the Supreme Court may now be cited as precedent, as well as unpublished orders and opinions of the lower courts.").

because of damage to the racecar sustained in an accident at the Lime Rock race. Two weeks after the VICI racecar sustained damage, Meixner faxed a notice to T-Mobile's president and legal department explaining that the car would be out of commission for 45 to 60 days. VICI resumed racing in October 2009 at Mazda Raceway Laguna Seca.

[]T-Mobile argues that VICI improperly invoked the force majeure provision of the agreement because the interference that prevented VICI from racing was a financial one. The court need not address T-Mobile's legal arguments on this basis because its contention is factually inaccurate. . . . The interference was the damage sustained in the accident at the Lime Rock race. The fact that money can solve a problem does not mean that a lack of money caused the problem. The court finds that VICI's failure to race the T-Mobile Le Mans car at four races was not a breach of contract because Meixner adhered to the force majeure procedures outlined in section 13.2 of the agreement.

*VICI Racing*, 921 F. Supp. 2d at 332 (citations and footnotes omitted).

T-Mobile argues, as it did before the District Court, that VICI's force majeure argument impermissibly relies on economic hardship, which cannot excuse performance under Delaware law. In support of this contention, T-Mobile points out that a VICI representative testified that VICI could have raced in the next race following the accident if it had been in a healthier financial condition. As such, T-Mobile contends

23

that a mere increase in expense does not constitute a force majeure.

As the District Court correctly recognized, T-Mobile misinterprets the force majeure law regarding economic hardship. The law makes clear that reasonable, unextreme economic hardship cannot constitute a force majeure itself. However, the force majeure—as recognized by the District Court—was not an economic hardship but rather an automobile crash. *Id.* (stating that the condition preventing performance "was the damage sustained in the accident at the Lime Rock race"). Thus, the only case law relied upon by T-Mobile has no present bearing since it merely supports the general proposition that financial hardship itself does not constitute a condition excusing performance under a force majeure provision.

## 1. Foreseeability as Requisite for Force Majeure to Excuse Non-Performance

T-Mobile also argues that VICI failed to prove that the condition preventing performance—the damage to the racecar—could not have been foreseen at the time the parties entered the Agreement. It contends that there was no evidence in the record suggesting that the automobile crash and the subsequent damage caused by it could not have been foreseen and thus that the force majeure provision does not apply. VICI responds that neither the type of damage to the car, the type of repairs needed as a result of that damage, nor the lack of parts available to do those repairs, could have been foreseen.

As a preliminary point, we note that the force majeure provision in the Agreement imposes three conditions—that "(1) the prevented obligation is a nonmonetary obligation that is prevented by a condition beyond a party's control; (2) the

affected party provides prompt notice of the interference, its nature, and expected duration; and (3) performance of the prevented obligation resumes as soon as the interference is removed"—none of which mention foreseeability. *VICI Racing*, 921 F. Supp. 2d at 333. Nevertheless, some courts have inferred such a condition even where the contract makes no mention of it.

However, because T-Mobile did not raise the foreseeability issue below, *see, e.g.*, J.A. 78, it may not secure appellate relief on this issue. *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.*, 706 F.3d 217, 226 (3d Cir. 2013). "It is axiomatic that arguments asserted for the first time on appeal are deemed to be waived and consequently are not susceptible to review in this court absent exceptional circumstances." *Tri-M Grp., L.L.C. v. Sharp*, 638 F.3d 406, 416 (3d Cir. 2011) (internal quotation marks omitted). This waiver rule serves several important judicial interests, such as "protecting litigants from unfair surprise; promoting the finality of judgments and conserving judicial resources; and preventing district courts from being reversed on grounds that were never urged or argued before them." *Id.* (alternation and internal quotation marks omitted). Because T-Mobile did not present the foreseeability argument to the District Court, we deem it waived.

Even if T-Mobile had not waived the foreseeability argument, we would be required to predict how the Delaware Supreme Court would rule on this question, since that Court has yet to address the issue. The only Delaware court to address the topic is the Court of Chancery in *Stroud*. There, the Chancery Court interpreted a contract for the acquisition of two townhouses in the process of being built. The contract included a force majeure clause that enumerated several types of events that would fall within the provision's scope, but also

25

included a catch-all phrase: "or any other reason whatsoever beyond the control of" the party. *Stroud*, 2004 WL 1087373, at \*5. The real estate developer argued that the force majeure clause excused its performance due to a series of delays caused by the inspection and rejection of the water detention pond and delays in obtaining the final County approval. *Id.* at \*6-7. The Chancery Court rejected these arguments, noting that such delays were "almost inevitable in the real estate development setting" and that "every event that, in some sense, 'delays' progress is not the meat of a force majeure clause." *Id.* at \*5, \*7. In light of those considerations, the Court reasoned that,

> [u]ltimately, the most likely expectation of the parties to the Agreement [was] that the *force majeure* clause encompasses two concepts: first, that the delay-causing event was beyond the reasonable control of [the development company] and, second, that the event was not reasonably foreseeable in the ordinary course of real estate development.

*Id.* at \*5.

At no point did the Court in *Stroud* suggest that all force majeure clauses must be read to incorporate the concept of foreseeability. Rather, the Chancery Court engaged in standard contractual analysis to determine the intent of the contracting parties, and found that, given the nature of the real estate industry, the parties expected the clause to include such a concept.

Other courts have found that contractual force majeure provisions that do not discuss whether the excusing event must be unforeseeable should be construed to require unforseeability. Indeed, in *Gulf Oil Corp.*, 706 F.2d at 453,

this Court considered a force majeure provision in a gas warrant contract and observed that: "To support a definition of force majeure in a warranty contract, we must stress the element of uncertainty or lack of anticipation which surrounds the event's occurrence and must affect the availability and delivery of gas." *Id.* In reaching the result, we expressly rejected petitioner's argument "that the contract terms are to protect the parties from both foreseeable and unforeseeable events." *Id.* Again, the opinion made much of the specific circumstances of the gas industry, even stating that "[o]ur decision is based on the contract's daily warranty." *Id.* at 453.

There is some rationale to suggest that a racecar crash during a competitive car race, as the mechanical breakdowns and maintenance repairs at issue in *Gulf*, should not constitute a force majeure because "their frequent, almost predictable, occurrence takes them outside of a *force majeure* excuse to non-performance." *Id.* at 454. Nevertheless, because the Agreement does not expressly incorporate a non-foreseeability condition into its terms and because T-Mobile did not raise the issue at the trial level, we decline to reach the issue here. It would be ill-advised to wade into the uncharted waters of Delaware state law without a fully developed record on the issue at the trial level.[10] For example, there are facts in

---

[10] The Court notes that certain arguments by VICI suggest that the parties were aware of the possibility of a racecar accident and the consequences that would result. In VICI's opening statement, counsel stated that Ron Meixner explained to T-Mobile representatives that "if we have one car and the car has a problem, we can be out of racing for a while." J.A. 142. Counsel additionally argued that, after the accident, Mr. Meixner then told T-Mobile: "I told you this would be a problem." J.A. 145.

the record to suggest that T-Mobile did not notify VICI that it considered the failure to race to constitute a breach and did not terminate the contract upon VICI's failure to breach, which might suggest either that T-Mobile deemed the non-performance to be either non-material or excused by the force majeure provision.

Moreover, the application of the waiver doctrine here serves to protect at least the three judicial interests noted above: "protecting [VICI] from unfair surprise; promoting the finality of judgments and conserving judicial resources; and preventing district courts from being reversed on grounds that were never urged or argued before them." *Tri-M Group, LLC*, 638 F.3d at 416 (alternation and internal quotation marks omitted).

Because a factual record on this line of argument was not developed, and in view of the judicial interests that the waiver doctrine is designed to protect, the most prudent course of action is to deem the foreseeability issue waived. Therefore, we affirm the District Court's findings on this issue. The consequences of this holding are discussed below in the context of VICI's cross-appeal.

## VI. Liquidated Damages

T-Mobile claims that the District Court erred when it awarded $7 million to VICI based on T-Mobile's failure to make the 2010 payment. It argues that by awarding the full 2010 payment amount the District Court failed to properly apply the principles of expectation damages.[11] VICI, in its

---

[11] T-Mobile also argues that the District Court should have awarded T-Mobile, not VICI, damages under a *quantum meruit* theory. Because we hold that there was a binding contract between the parties, T-Mobile's argument fails. *See*

cross-appeal, claims that the District Court erred when it declined to award $7 million for T-Mobile's failure to make the 2011 payment. VICI argues that section 11.2 of the Agreement is a liquidated damages clause that precludes the District Court from awarding anything other than $14 million to VICI—that is, the total amount that T-Mobile failed to pay under the Agreement.

We first address VICI's contention that section 11.2 of the Sponsorship Agreement was a liquidated damages clause, for a finding in VICI's favor on this point would moot any further discussion of damages.

The District Court characterized section 11.2 as a "quasi liquidated damages provision." *VICI Racing*, 921 F. Supp. 2d at 334 n.22.[12] It went on to note that, if it awarded the second $7 million payment as liquidated damages, then that award would be "unreasonably large" and thus "unenforceable on grounds of public policy as a penalty." *Id.* We review a district court's construction of a contract *de novo*. *Ram Constr. Co., Inc. v. Am. States Ins. Co.*, 749 F.2d 1049, 1053 (3d Cir. 1984) ("Construction, which may be

---

*Chrysler Corp v. Airtemp. Corp.*, 426 A.2d 845, 853-54 (Del. Super. Ct. 1980) (summary judgment) ("With respect to the theory of quantum meruit or contract implied by law, courts of this State have long recognized that recovery on such a theory will be considered only if it is determined that the relationship of the parties is not governed by an express contract.").

[12] As an initial matter, we disagree with the District Court's implied adoption of a "quasi liquidated damages" doctrine because under Delaware law a provision either calls for liquidated damages or it does not.

usefully distinguished from interpretation, is a process by which legal consequences are made to follow from the terms of the contract and its more or less immediate context . . . . When construction of a contract is the issue before an appellate court, the question is one of law and freely reviewable." (internal quotation marks and citations omitted)).

In Delaware, "[c]ontract law allows parties to establish only a good faith estimation of actual damages sustained as a result of a contract's termination." *Del. Bay Surgical Servs., P.C. v. Swier*, 900 A.2d 646, 650 (Del. 2006). This good faith estimation is known as liquidated damages.

> Liquidated damages are a sum to which the parties to a contract have agreed, at the time of entering into the contract, as being payable to satisfy any loss or injury flowing from a breach of their contract. It is, in effect, the parties' best guess of the amount of injury that would be sustained in a contractual breach, a way of rendering certain and definite damages which would otherwise be uncertain or not easily susceptible of proof.

*Id.* (quoting *S.H. Deliveries, Inc. v. Tristate Courier & Carriage, Inc.*, Case No. 96C-02-086-WTQ, 1997 WL 817883, at *6-8 (Del. Super. Ct. May 21, 1997)).

To determine whether a contractual provision is one for liquidated damages, Delaware courts ask whether the provision unambiguously demonstrates the parties' intention to set a fixed amount to be paid in the event of breach. *See Ballenger v. Applied Digital Solutions, Inc.*, Case No. Civ.A.19399, 2002 WL 749162, at *12 (Del. Ch. April 24, 2002) (noting that creation of a liquidated damages provision

"must have been the unambiguous intention of the contracting parties"); *PSL Air Lease Corp. v. E.B.R. Corp.*, Case Nos. 757-Civ.A.1970 and 758-Civ.A.1970, 1974 WL 173050, at *3 (Del. Super. Ct. Oct. 17, 1974) ("Because the lease provision does not clearly and unambiguously fix an amount to be paid as damages[,] the clause is not a liquidated damages clause."). A term is ambiguous when the provision is "reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

Section 11 of the Agreement, entitled "Limitation of Liabilities," provides:

> 11.1 Even if either party . . . has been advised of the possibility of damages, they will not be liable to the other party. . . for any damages . . . including without limitation: special, indirect, incidental, punitive, consequential, or treble damages; loss of privacy damages[,] personal injury or property damages; or *any damages whatsoever* resulting from the transactions contemplated under this agreement.

> 11.2 The *maximum* aggregate liability of either party . . . and the *exclusive* remedy available in connection with this agreement for any and all damages, injury, losses arising from any and all claims and/or causes of action, shall be limited to *$50,000 or the aggregate payments payable under this agreement* [$14 million], whichever is *higher*. . . .

J.A. at 892 (emphases added and some capitalization omitted).

31

VICI claims that sections 11.1 and 11.2 operate together to limit recoverable damages (section 11.1) and specify the exact liquidated remedy (section 11.2). According to its interpretation, section 11.1 prohibits "any damages whatsoever" while section 11.2 provides the "exclusive remedy": $50,000 or the amount remaining on the contract, whichever is higher. VICI also relies on a survivorship clause in the Agreement that provides that section 11 "survive[s] any termination of this Agreement for any reason" as additional support for its interpretation. *Id.*

We are not persuaded that section 11.2 is a liquidated damages clause. First, section 11's heading reads "Limitation of Liabilities," not "Liquidated Damages." Although a provision's heading is not dispositive to the analysis, *Donegal Mut. Ins. Co. v. Tri-Plex Sec. Alarm Sys.*, 622 A.2d 1086, 1089 (Del. Super. Ct. 1992), the remainder of section 11.2 is replete with language that establishes that this clause is indeed a liability limitation provision. First, section 11.2 sets the "maximum aggregate liability" under the contract. Limiting the maximum liability does not set a fixed sum, as required under Delaware liquidated damages law; it merely erects a damages ceiling. Second, the provision states that any and all damages "shall be limited"—words that communicate an unmistakable intention to limit liability, not set a fixed sum. Finally, the payments contemplated by the provision also fail to set a fixed sum. Instead, it calls for a payment of $50,000 or the "aggregate payments payable under the agreement, whichever is higher."

The structure of the rest of the Agreement also supports the conclusion that section 11.2 was not intended to provide liquidated damages. A liquidated damages provision is permitted when the damages from a breach would otherwise be difficult to predict or calculate. *Del. Bay Surgical Servs., P.C.*, 900 A.2d at 651. The payment

schedule set forth in section 4 of the Agreement, however, makes it clear what damages VICI could expect to incur in the event of a breach.[13] Section 11's limitation- of-liability language, when read together with section 4, clearly sets the maximum possible damages available to VICI. Accordingly, it makes little sense to construe a clause to be a liquidated damages provision when damages are relatively easy to calculate by reference to the Agreement.

As VICI recognizes, section 11.2 does use the phrase "exclusive remedy," which could suggest that the provision contemplates a liquidated remedy. The better reading of those words, however, is that T-Mobile's liability is limited to

---

[13] For the sake of convenience, we set out this provision again:

4.    FEES AND MARKETING SUPPORT

4.1    [T-Mobile] agrees to pay VICI the following sponsorship fees during the Initial Term:

2009 Race Season: $1,000,000.00 payable by April 1, 2009;

2010 Race Season: $7,000,000.00 payable by January 1, 2010; and

2011 Race Season: $7,000,000.00 payable by January 1, 2011.

J.A. at 887-88.

paying $50,000 or the remainder owed under the contract, whichever is higher.  As we have discussed, these payment possibilities essentially reiterate the expectations of the parties under the contract and thus do not provide for liquidated damages.  Moreover, even if the words "exclusive remedy" would support a liquidated damages reading, the remainder of section 11.2 would be ambiguous at best.  Under Delaware law, a liquidated damages clause must be unambiguous.  *Ballenger*, 2002 WL 749162, at *12.  We therefore affirm the District Court's judgment not to construe the Agreement to provide a liquidated damages remedy.

## VII. The District Court's Damages Calculation for the 2010 Payment

Because section 11.2 is not a liquidated damages provision, we turn to whether the District Court properly awarded expectation damages under the contract.

We note at the outset that T-Mobile failed to raise any issue related to damages in its pretrial statement, J.A. 78, or at trial.  After the Court issued its judgment, T-Mobile could have filed a motion for a new trial or a motion to set aside the judgment on the ground that the damages award was excessive, pursuant to Federal Rule of Civil Procedure 50.  It did neither.  Accordingly, T-Mobile did not preserve any argument about damages for appeal.  *See Brenner v. Local 514, United Bhd. of Carpenters*, 927 F.2d 1283, 1298 (3d Cir. 1991) ("It is well established that failure to raise an issue in the district court constitutes waiver of the argument.").  Even if T-Mobile's arguments were properly before the Court, we find that they lack merit.

Review of the District Court's damages calculation is a mixed question of law and fact.  The determination of what legal standard to apply when calculating damages, and

whether that standard was properly applied, are questions of law.  The determination of facts upon which to apply this legal standard is a question of fact.  Accordingly, we "must accept the trial court's findings of historical or narrative facts unless they are clearly erroneous, but we must exercise plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts."  *Univ. Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 103 (3d Cir. 1981).

In assessing the damages that resulted from this breach, the District Court bifurcated its analysis, addressing the damages incurred from the failure to make the 2010 and 2011 payments separately.  We structure our analysis along similar lines.  This section, part VII, focuses on the District Court's $7 million damages award based on T-Mobile's failure to make the 2010 payment under the agreement.  Part VII.A.1 concludes that the District Court used the proper legal standard when calculating damages for the 2010 payment.  Part VII.A.2 concludes that it did not err in applying this standard with regard to VICI's losses and the costs it avoided as a result of T-Mobile's breach.  Parts VII.B.1 and VII.B.2 discuss the nature of mitigation damages as an affirmative defense.  Part VII.B.3 concludes that the District Court did not err in calculating VICI's 2010 damages without regard to mitigation because T-Mobile waived that affirmative defense.  Part VIII addresses the ruling of the Court regarding the 2011 payment and concludes that the Court applied the wrong legal standard in reaching its conclusions.  Part IX briefly concludes.

### A.     Expectation Damages

T-Mobile claims that the District Court failed to apply "any legally-recognized measure" of damages.  Appellant's Initial Br. at 41.  It also claims that the Court failed to deduct

the actual costs avoided by VICI as a result of T-Mobile's breach and failed to deduct the costs that VICI could have avoided through reasonable mitigation efforts.

### 1.    The District Court Used the Proper Legal Standard to Determine VICI's Damages Regarding the 2010 Period

We first review whether the District Court used the proper legal standard in awarding expectation damages. According to the Restatement (Second) of Contracts § 347, expectation damages are calculated by (1) the loss to the non-breaching party (2) plus any loss, including incidental or consequential loss, caused by the breach (3) less any cost or other loss that the non-breaching party avoided by not having to perform.  In other words, "expectation damages is measured by the amount of money that would put the promissee in the same position as if the promisor had performed the contract." *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001) (citing Restatement (Second) of Contracts § 347 cmt. a).

Expectation damages may not be speculative.  When establishing the loss the non-breaching party incurred as a result of the breach, a plaintiff must "'lay a basis for a reasonable estimate of the extent of his harm, measured in money.'"  *Emmet S. Hickman Co. v. Emilio Capaldi Developer, Inc.*, 251 A.2d 571, 573 (Del. Super. Ct. 1969) (quoting 5 Corbin on Contracts, 125 Pt. 6, Ch. 56 § 1020).  Additionally, a plaintiff may only recover those damages that were foreseeable or likely to follow from the breach of an agreement. *McClain v. Faraone*, 369 A.2d 1090, 1092 (Del. 1977).

Once the loss attributable to nonperformance has been determined, a court must subtract any costs avoided as a

result of the breach that are evident in the record. *WaveDivision Holdings, LLC v. Millennium Digital Media Sys., L.L.C.*, Case No. 2993-VCS, 2010 WL 3706624, at *19-20, *23 (Del. Ch. Sept. 17, 2010) ("[Plaintiff] is only entitled to recover the net loss it has suffered because of [Defendant's] breach."). A court must also reduce the calculated damages by the amount of loss "'that [the plaintiff] could have avoided by reasonable efforts.'" *W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, Case No. 2742-VCN, 2009 WL 458779, at *4 (Del. Ch. Feb. 23, 2009) (quoting Restatement (Second) of Contracts § 350 cmt. b).

T-Mobile claims that the District Court awarded VICI $7 million for the 2010 period without applying any legally-recognized measure of damages. We disagree. The District Court recited the proper standard, including the requirement to reduce damages by the amount of actual costs avoided:

> Generally, "the non-breaching party is entitled to recover 'damages that arise naturally from the breach or that were reasonably foreseeable at the time the contract was made.' Contract damages 'are designed to place the injured party in an action for breach of contract in the same place as he would have been if the contract had been performed. Such damages should not act as a windfall.'" *Paul v. Deloitte & Touche, LLP,* 974 A.2d 140, 146–47 (Del. 2009) (citations omitted); *Duncan v. Theratx, Inc.,* 775 A.2d 1019, 1022 (Del. 2001) (citing Restatement (Second) Of Contracts § 347). Further, damages should be reduced by costs or other loss avoided by the non-breaching party. *See* Restatement (Second) Of Contracts § 350. "[A] party may avoid costs by suspending its own performance when confronted with breach

and avoid loss by making substitute arrangements." *West Willow–Bay Court, LLC v. Robino–Bay Court Plaza, LLC,* No. 2742–VCN, 2009 WL 458779, at *4 (Del. Ch. Feb. 23, 2009) (citing Restatement (Second) Of Contracts § 350 cmt. b ("Once a party has reason to know that performance by the other party will not be forthcoming, he is ordinarily expected to stop his own performance to avoid further expenditure.")). Also, a party may not generally recover damages for losses that it could have avoided by reasonable efforts. *Id.* (citing Restatement (Second) Of Contracts § 350 cmt. b). Thus, the injured party has a duty to mitigate or minimize its costs and losses. *Id.* (citing Restatement (Second) Of Contracts § 350 cmt. b) (noting that "the injured party is under no obligation to [mitigate], although it will not be awarded damages for any loss that could be avoided").

*VICI Racing, LLC v. T-Mobile USA*, Inc., 921 F. Supp. 2d 317, 333 (D. Del. 2013).

> **2. The District Court Did Not Err in Applying the Proper Damages Standard or Clearly Err in Finding Facts to Support Its Damages Award for the 2010 Period Regarding Actual Costs Avoided**

T-Mobile next argues that the District Court did not properly apply the correct legal standard to the facts in the record because it failed to subtract the costs VICI avoided by not racing in 2010.

In applying the expectation damages standard, the District Court made findings about what VICI expected to gain from T-Mobile under the contract. The Court looked to the language of the sponsorship agreement, as the best evidence of the expectations of the parties, to find that VICI expected to receive $7 million in 2010. *Id.* at 344; *see also Eagles Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."). Section 4 of the Sponsorship Agreement clearly delineates the monetary payments that VICI expected to receive and that T-Mobile expected to pay. *See supra* note 13. Based on the timing of T-Mobile's breach, section 4's payment schedule supports the District Court's finding that VICI expected to receive a $7 million payment on January 1, 2010.

The Court then made affirmative findings about the expenses and losses that VICI incurred as a result of the breach. For instance, it credited Meixner's testimony that a normal budget for a car was $5 million, though the bottom line was $2.5 million. *VICI Racing,* 921 F. Supp. 2d at 333. It also found that VICI incurred losses in the 2009 season to help make up for the underfunded 2009 budget T-Mobile provided that year, although VICI offset some of these expenses with additional sponsorships. *Id.* It found that VICI incurred additional expenses to pay for the damaged racecar in 2009. *Id.* at 334. And it found that VICI incurred expenses in 2009 to help prepare for the 2010 season. *Id.*

The District Court's citations to the record provide substantial support for finding that VICI incurred losses and costs as a result of the breach. These costs included loans to float the team in 2009 that VICI expected to repay with the

2010 payment, J.A. 391-93 (cited by the District Court at *VICI*, 921 F. Supp. 2d at 334)[14]; the costs of repairing the car in 2009, *id.* at 395 (cited by the District Court at *VICI*, 921 F.

---

[14]   Counsel (Q):     But you had a car?
Meixner (A):     I had a car.
Q:   And you had equipment, correct?
A:   Yes.
Q:   And you had assets?
A:   Yes.
Q:   And you had a house that your wife and children lived in; correct?
A:   Yes.
Q:   You had all of these things.  And where did the money come from to go between a million and two-and-a-half million?
A:   From us and from—we borrowed money and all kinds of things.
Q:   And all the various amounts that Mr. Lowery was discussing that you owe this money and that money and this judgment, that judgment—
A:   Yes.
Q:   —the mortgage foreclosure against your house?
A:   Yes.
Q:   All because you didn't have enough money to do this deal?
A:   Yes.
Q:   Why did you do it?
A:   Because I know I'm going to get a payment in January of 2010.

J.A. 391-393.

Supp. 2d at 334)[15]; and the costs of preparing to race for 2010, *id.* at 415 (cited by the District Court at *VICI*, 921 F. Supp. 2d at 334).[16]

Despite these testimony excerpts and findings, T-Mobile claims that the District Court erred by failing to make findings regarding the actual costs avoided by VICI and by

---

[15] Q:   Okay.  Did you pay for the engine from Porsche?
A:   Yes.
Q:   Did you pay for all the repairs to the car?
A:   Yes.
Q:   And the car actually ran again, didn't it?
A:   Yes.  And it ran perfectly.
Q:   So whatever you had to do to scrape together the money to run the car, you did?
A:   We did.

J.A. 395.

[16] Q:   Okay, What if anything, did you do with respect to requirements under the contract between October 9th of 2009 and January 5th of 2010?
A:   Well, we were preparing for the next—for the new season.
Q:   Could you explain to the Court what you did?
A:   Well, we ordered another trailer because it was going to be two cars next year.  And we had new staff on standby, because we tried some other people.  And I had ordered two Porsches from Porsche, for two race cars.

J.A. 415.

failing to deduct those costs from VICI's damages award. T-Mobile cannot prevail on these arguments. First, it made none of these arguments in its pretrial statement, J.A. 78, during the trial, in post-trial briefing, *id.* at 1339 and 1414, or in post-trial motions. Second, although the District Court did not expressly state that costs were actually avoided, what those avoided costs were, or whether those costs were offset by VICI's losses as a result of the breach, not expressly making these findings is not a reason to reverse or remand.

T-Mobile argues that because the District Court awarded VICI $7 million—the same amount that VICI would have received in 2010 had T-Mobile performed under the contract—it therefore failed to deduct the actual costs VICI avoided by not racing in 2010. Although the Court did not make express findings about the actual costs avoided by not racing, T-Mobile is incorrect in asserting that it failed to apply the proper damages standard.

As quoted *supra* Part VII.A.1, the District Court correctly identified—and thus was well aware of—its duty to deduct actual costs avoided from its damages calculation. The better reading of the Court's opinion is that it implicitly concluded that any actual costs avoided were offset by other losses VICI incurred.

The District Court did not conclude that VICI was entitled to damages based on the contract alone. The fact that it considered the additional losses suffered by VICI over the course of 2009 and 2010 indicates that it considered gains and losses in addition to the gross revenue VICI anticipated receiving from T-Mobile under the contract. By taking the time to cite examples of these losses, and then awarding VICI $7 million, the Court implicitly found that there were no costs avoided relative to the losses incurred by VICI as a result of the breach. *See W. Willow-Bay Court,* 2009 WL 458779, at

*4 ("Damages are awarded in an amount equal to the loss in value occasioned by the defendant's nonperformance."); Restatement (Second) of Contracts § 347 (stating that a party's expectation interest includes "the loss in value to him of the other party's performance caused by its failure . . . *plus any other loss* . . . caused by the breach . . . .") (emphasis added).

In view of the fact that T-Mobile never raised this issue pre-trial, never argued to the District Court at trial that VICI actually avoided costs, and never objected post-trial to the Court's analysis, the Court was under no obligation to make a specific finding about costs avoided—that is, it did not have to expressly find that the actual costs avoided were offset by VICI's losses. The Court fully discussed the expenses and losses VICI incurred in attempting to fulfill the contract. *See supra* notes 14-16 and accompanying text. Implicit in these findings is the conclusion that the costs avoided by VICI not racing in 2010 did not warrant a reduction in the damages award, given the expenses and losses sustained by VICI. A trial court's findings are sufficient if the affirmative facts found by it, construed as a whole, negate a rejected contention. *Rayonier, Inc. v. Polson*, 400 F.2d 909, 923 (9th Cir. 1968); *see also Bowles v. Cudahy Packing Co.*, 154 F.2d 891, 894 (3d Cir. 1946) ("The trial court is not required to make findings on all the facts presented and need only find such ultimate facts as are necessary to reach the decision in the case. The judgment should stand if the opinion below gives the appellate court a clear understanding of the basis of the decision." (internal quotation marks, alterations, and citations omitted)). The District Court's affirmative findings dispensed with the need to expressly find that the costs that were actually avoided were not greater than the losses incurred by VICI as a result of the breach. Accordingly, it did not commit legal error in calculating VICI's damages regarding actual costs avoided.

43

Next, the District Court did not commit clear error in its fact-finding when it determined that the actual costs avoided by VICI were offset by its losses.

There is evidence in the record that VICI actually avoided certain costs—namely, VICI avoided the costs associated with racing in 2010. As discussed above, the question that the District Court implicitly answered was that the losses suffered by VICI were offset by the actual costs avoided. There is no precise indication in the record as to how much money was spent in 2009 and 2010 to fund the 2009 season and prepare for the 2010 season. Similarly, there is no precise indication in the record as to what costs were actually avoided by not racing. All the record makes clear is that there were some losses incurred and some costs avoided. To that extent, there is no precise evidence in the record as to whether VICI actually experienced a loss greater than its expected gain from the contract and the costs it avoided by not racing in 2010.

"Fact finding does not require mathematical certainty." *Schulz v. Pa. R.R.*, 350 U.S. 523, 526 (1956). Because the District Court is not required to rule with mathematical precision, because T-Mobile ignored the damages issue below, and because VICI introduced evidence as to both the losses it incurred and the costs it avoided in 2010, the Court's implicit finding that any actual costs avoided were offset by VICI's losses need not be disturbed. "[I]t is the very essence of the trial court's function to choose from among the competing and conflicting inferences and conclusions that which it deems most reasonable." *Evans v. United States*, 319 F.2d 751, 755 (1st Cir. 1963). Accordingly, "an appellate court has no power to disturb a finding of fact of a trial court where it is based on some substantial though conflicting evidence." *Id.* at 753; *see also Frederick v. United States*, 386 F.2d 435, 435 (3d Cir. 1967) ("Upon conflicting evidence

the district court found that the appellant had not established this factual claim. That finding was permissible and we sustain it.").

Whatever our own views of the evidence, whether we believe that the actual costs avoided warrant a reduction in the $7 million award or not, it is not our charge to remand to the District Court to perform a recalculation based on a difference of opinion. *See Speyer, Inc. v. Humble Oil and Refining Co.*, 403 F.2d 766, 770 (3d Cir. 1968) ("In reviewing the decision of the District Court, our responsibility is not to substitute findings we could have made had we been the fact-finding tribunal; our sole function is to review the record to determine whether the findings of the District Court were clearly erroneous, i.e., whether we are 'left with a definite and firm conviction that a mistake has been committed.'" (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1949)) *abrogated on other grounds by Francioni v. Gibsonia Truck Corp.*, 372 A.2d 736, 739-751 (Pa. 1977).

Based on a review of the record, it is clear that, not only were the District Court's findings free from clear error, they were supported by substantial evidence. Accordingly, we cannot question the District Court's award any more than we could question an award made by a jury. Indeed, if the District Court had instructed a jury on the damages standard recited in its opinion; and a jury had reviewed the evidence in the record; and upon that review the jury determined that a $7 million award was appropriate, the jury award would be impervious to appellate second-guessing. Given the evidence in the record, we are obliged to afford the District Court similar deference.

Specifically, this Court can only find error in a district court's factual finding if it is "completely devoid of minimum evidentiary support displaying some hue of credibility" or

45

unless it "bears no rational relationship to the supportive evidentiary data." *Berg Chilling Sys.,* 369 F.3d at 754 (citations omitted). Based on the record citations in the District Court's opinion, we cannot say that the District Court clearly erred. Its finding—albeit implicit—is not completely devoid of minimum evidentiary support and bears a rational relationship to the supportive evidentiary data. For these reasons, we have no power to disturb that finding and reject T-Mobile's contentions to the contrary.

## B. Mitigation of Damages

### 1. The Breaching Party Has the Duty to Mitigate Damages

First year law students are generally taught that a plaintiff claiming breach of contract himself has a duty to mitigate. 11 Corbin on Contracts, § 57.11 (1993) ("It is not infrequently said that it is the 'duty' of the injured party to mitigate damages so far as can be done with reasonable effort."). However, that maxim has a corollary: "[t]he burden of proving that losses could have been avoided by reasonable effort and expense must always be borne by the party who has broken the contract." *Id.*

Delaware law is consistent. Although there is no specific precedent from the Delaware Supreme Court or this Court applying Delaware law, lower Delaware courts and the District Court of Delaware consistently apply Delaware law to conclude mitigation is an affirmative defense. Moreover, we have been unable to find any cases to the contrary. *See Stinson v. Edgemoor Iron Works*, 53 F. Supp. 864, 868 (D. Del. 1944) (concluding, in the absence of clear Delaware Supreme Court authority, Delaware would follow the general weight of authority and hold that "the burden of pleading and proving mitigation of damages is upon the defendant");

Steven W. Feldman, *Autonomy and Accountability in the Law of Contracts: A Response to Professor Shiffrin*, 58 Drake L. Rev. 177, 241 (2009) ("[T]he overwhelming weight of authority states that the breaching promisor must prove that the promisee inappropriately failed in avoiding or alleviating his injury." (internal quotation marks omitted)).

The Supreme Court of Delaware has held that a "party has a general duty to mitigate damages if it is feasible to do so." *Brzoska v. Olson*, 668 A.2d 1355, 1367 (Del. 1995) (remanding on whether mitigation was reasonable). "[B]ut whether mitigation is required depends upon the circumstances of the case and is subject to a rule of reasonableness." *Lynch v. Vickers Energy Corp.*, 429 A.2d 497, 504 (Del. 1981) (citations omitted) (reversing judgment for the defendants after a bench trial because the lower court incorrectly found failure to mitigate) *overruled on other grounds by Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983). Mitigation is a limitation on the plaintiff's ability to recover damages that could have been avoided. *W. Willow-Bay Court, LLC*, 2009 WL 458779, at *4 (observing that, as "a general rule, a party cannot recover damages for loss that he could have avoided by reasonable efforts," and finding after a damages trial that the plaintiff made reasonable, although unsuccessful, effort to mitigate (quoting Restatement (Second) of Contracts § 350 cmt. b)).

But this mitigation is a burden of conduct, not a burden of proof at trial. *Conway v. Hercules Inc.*, 831 F. Supp. 354, 359 (D. Del. 1993) (finding in a pre-trial order that "[d]efendant asserts plaintiff must show he mitigated his damages with 'reasonable diligence,' but in so asserting . . . defendant confuses the duty with the burden." (citation omitted)). A plaintiff must prove damages, and a defendant may show those damages should be limited because the plaintiff failed to take reasonable mitigating measures.

*Tanner v. Exxon Corp.*, Case No. 79C-JA-5, 1981 WL 191389, at *4 (Del. Super. Ct. July 23, 1981) (denying the defendant's motion for summary judgment because the defendant did not plead mitigation and produced no evidence its theory of mitigation was feasible). The party asserting the limitation bears the burden of proof. *Id.*

### 2. Failure to Mitigate is an Affirmative Defense

Numerous Delaware Superior Court cases and District Court of Delaware cases have held failure to mitigate is an affirmative defense. *Route 40 Holdings v. Tony's Pizza & Pasta Inc.*, Case No. 10c-03-057, 2010 WL 2161819, at *1 (Del. Super. Ct. May 27, 2010) (dismissing the defendant's counterclaim for failure to mitigate because "[c]ourts often refer to this concept as a 'duty to mitigate,' [but] technically it is not a duty because there are no damages for breach of the duty" and therefore is a defense to be pled in the defendant's answer) (internal quotations omitted); *Tanner*, 1981 WL 191389, at *4 ("Failure to mitigate damages is an affirmative defense, and the burden of proving the failure falls upon the defendant."); *O'Riley v. Rogers*, Case No. S08C-07020RFS, 2011 WL 3908404, at *2-3 (Del. Super. Ct. Aug. 30, 2011) (applying *Tanner* to personal injury cases in denying the defendant's motion for a new trial based on failure to mitigate); *Munro v. Beazer Home Corp.*, Case No. U608-03-081, 2011 WL 2651910, at *8 (Del. C.P. June 23, 2011) (in a post-trial opinion on allocation of damages the court found "Delaware recognizes the affirmative defense of failure to mitigate damages"); *Conway*, 831 F. Supp. at 359 ("The mitigation of damages is an affirmative defense."). Since it is an affirmative defense, the breaching party bears the burden of proof. *Conway*, 831 F. Supp. at 359 ("[T]he burden of proving plaintiff failed to mitigate his damages falls squarely on defendant."); *Stinson*, 53 F. Supp. at 868 ("The general

authority—and, in fact, the almost universal weight of authority—is that the burden of pleading and proving mitigation of damages is upon the [breaching party].").[17]

The Restatement (Second) of Contracts also looks to the breaching party to show that a substitute transaction was available. Restatement (Second) Contracts § 350 cmt. c. It states that "damages are not recoverable for loss that the

---

[17] This Court has consistently held the breaching party bears the burden to show failure to mitigate in cases applying the law of other states. *Glenn Distributors Corp. v. Carlisle Plastics, Inc.*, 297 F.3d 294, 302 (3d Cir. 2002) ("[T]he party who has breached the contract or caused the loss has the burden of showing the losses could have been avoided through the reasonable efforts of the damaged party." (emphasis omitted) (Pennsylvania law)); *Koppers Co., Inc. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1448 (3d Cir. 1996) ("Mitigation is an affirmative defense, so the burden of proving a failure to mitigate is on the defendant."); *Fashauer v. New Jersey Transit Rail Operations, Inc.*, 57 F.3d 1269, 1288 (3d Cir. 1995) (holding the burden of proof "falls on the wrongdoer to show that the damages were lessened or might have been lessened by the plaintiff") (discussing *Jones v. Consol. Rail Corp.*, 800 F.2d 590, 593 (6th Cir. 1986)); *Kutner Buick, Inc. v. Am. Motors Corp.*, 868 F.2d 614, 620 (3d Cir. 1989) (reversing because the trial court incorrectly imposed the burden to "include in the [damages] calculation all offsets which would be proper mitigation of damages" on the plaintiff); *S. J. Groves & Sons Co. v. Warner Co.*, 576 F.2d 524, 529 (3d Cir. 1978) ("The burden of proving that losses could have been avoided by reasonable effort and expense must be borne by the party who has broken the contract.").

injured party could have avoided without undue risk, burden or humiliation." *Id.* § 350(1). The commentary explains "the burden is generally put on the party in breach to show that a substitute transaction was available. . . ." *Id.* § 350 cmt. c. Several Delaware courts have cited to section 350 approvingly in addressing the duty to mitigate. *See, e.g.*, *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1026 nn.22-23 (Del. 2001) (answering a certified question on the proper measure of damages); *John Petroleum, Inc. v. Parks*, Case No. 06C-10-039, 2010 WL 3103391, at *6 (Del. Super. June 4, 2010) (adopting the commissioner's report and recommendation that the plaintiff took reasonable measures to mitigate), *aff'd*, *Parks v. John Petroleum, Inc.*, 16 A.3d 938 (Del. 2011); *W. Willow-Bay Court, LLC*, 2009 WL 458779, at *8 & n.51.

When considered in the context of litigation, it follows that a defendant must show failure to mitigate. A plaintiff has the burden of proving damages. *Paul v. Deloitte & Touche, LLP*, 974 A.2d at 146-47 (affirming summary judgment for the defendant). But a plaintiff does not need to plead mitigation efforts. *Stinson*, 53 F. Supp. at 868. Rather, the defendant must plead failure to mitigate in its answer. *Route 40 Holdings*, 2010 WL 2161819, at *1 (explaining failure to mitigate is an affirmative defense available to a defendant in a contract dispute and is properly pled as a defense in the defendant's answer); *Tanner*, 1981 WL 191389, at *4 ("[I]t is necessary for the defendant to specially plead plaintiff's failure to mitigate damages.").

Thus, once a plaintiff proves its damages, a defendant has the burden to show the damages award should be limited because the plaintiff failed to take reasonable measures to mitigate its loss. *W. Willow-Bay Court, LLC*, 2009 WL 458779, at *8 (finding the plaintiff was entitled to the full expectation damages it had shown because the defendant's theory of mitigation was not reasonable). This inquiry

50

considers whether mitigation was feasible, what measures to limit damages were reasonable under the circumstances, and whether the plaintiff took sufficient measures to mitigate. *Brzoska*, 668 A.2d at 1367 (holding mitigation is required "if it is feasible to do so"); *Lynch*, 429 A.2d 497, 504 ("[W]hether mitigation is required depends upon the circumstances of the case and is subject to a rule of reasonableness."); *Krauss v. Greenbarg*, 137 F.2d 569, 573 (3d Cir. 1943) (affirming a jury verdict for the defendants' counterclaim, because "one is not required to go through the motions of attempting to avoid damages when it is certain that they will prove of no avail"). A defendant need not provide an accounting of the costs a plaintiff should have avoided, but the burden is properly on a defendant to articulate the actions that would have been reasonable under the circumstances to mitigate loss. *Collier v. Leedom Const. Co.*, 84 F. Supp. 348, 350-52 (D Del. 1949).

As with other affirmative defenses, a plaintiff cannot anticipate and answer all of the possible theories of mitigation. A defendant must put a plaintiff on notice as to what measures the defendant believes were reasonable under the circumstances but the plaintiff failed to take. *Cf. Lynch*, 429 A.2d at 505 (finding the mitigating measures the defendant asserted were unreasonable).

This principle is consistent with "the usual rule that the burden of proof rests upon him who alleges . . . ." *Murphy v. T. B. O'Toole, Inc.*, 87 A.2d 637, 638 (Del. Super. Ct. 1952) (citing 2 Jones Civil Evidence (Horwitz ed.) § 192 in granting summary judgment to the defendants); *see also Del. Coach Co v. Savage*, 81 F. Supp. 293, 296 (D. Del. 1948) (finding for the defendant after a bench trial because "[t]he burden of proof rests upon the party asserting the affirmative of an issue"). Similarly, the Restatement (Second) of Contracts Commentary provides that "the burden is generally put on the

party in breach to show that a substitute transaction was available . . . ." Restatement (Second) of Contracts § 350 cmt. c.

Accordingly, we must follow the Delaware cases holding that failure to mitigate is an affirmative defense and that a defendant bears the burden of proof to show a plaintiff's damages should be reduced on that basis. Affirmative defenses not raised in litigation are waived. *Abdi v. NVR, Inc.*, 945 A.2d 1167 n.6 (Del. 2008) (affirming the district court's jury instruction because the issue was tried by consent but observing that "[g]enerally, if a defendant does not plead an affirmative defense, he or she waives that defense" (quoting *Kaplan v. Jackson*, Case No. 90C-JN-6, 1994 WL 45429, at *2 (Del. Super. Ct. Jan. 20, 1994))).

### 3. T-Mobile Waived the Failure to Mitigate Defense

T-Mobile did not raise failure to mitigate in its pleadings or in its pre-trial Statement of Disputed Legal Issues. *See* J.A. 84-96. It did not offer any argument or evidence regarding failure to mitigate at trial. T-Mobile was in breach of contract but did not present any evidence or argument as to what measures VICI should have or could have taken to limit its loss but failed to take. The District Court did not make any findings about T-Mobile's failure to plead or raise failure to mitigate. The record is undisputed that T-Mobile did not raise this issue at any time during trial, and thus it waived its failure to mitigate damages defense.

The District Court, however, concluded that VICI had a responsibility to mitigate its damages and had the burden of presenting evidence of its efforts to do so. Finding that VICI had failed to satisfy this burden, the Court decided that it would not award damages related to the 2011 payment. In

other words, the District Court's handling of the mitigation issue was confined to the 2011 payment. We address the District Court's reasoning on that score in detail in Part VIII below. For the purposes of reviewing the 2010 award, however, it suffices to say that the District Court did not have to consider whether VICI failed to mitigate its damages or adjust the 2010 damages award based on that consideration. It therefore did not err when it limited its calculation of the 2010 damages award to the losses VICI incurred and the costs it avoided as a result of the breach by T-Mobile.

## VIII. The District Court's Damages Calculation for the 2011 Payment

As previously discussed, the Agreement provides that VICI would be entitled to an additional $7 million for its services under the contract during the 2011 racing season.[18] VICI asserts in its cross appeal, as it did in its complaint and at trial, that it was entitled to the second $7 million due in 2011.

At trial, VICI relied exclusively on the argument that the liquidated damages provision of the Agreement required the District Court to award the second $7 million. In rejecting this argument, the Court observed that "VICI had a responsibility to mitigate damages." *VICI Racing*, 921 F. Supp. 2d at 334. It then stated that

> VICI did not present evidence as to its efforts to mitigate T-Mobile's breach by trying to find a primary sponsor for the 2010 and 2011 seasons.

---

[18] As discussed *supra*, VICI did not race a car that season due to damage the car sustained in a crash, although that nonperformance was excused by the force majeure provision.

> Awarding the second $7 million, due by January 1, 2011, would provide VICI with an unfair windfall.

*Id.* The Court then elaborated on this conclusion in a footnote, where it observed that even if it found section 11.2 to be a liquidated damages clause, or a "quasi-liquidated" damage clause, "having the second $7 million payment survive the breach would render the liquidated damages 'unreasonably large' and 'unenforceable on grounds of public policy as a penalty.'" *Id.* n.22 (quoting Restatement (Second) of Contracts § 356).

Although we affirm the District Court in rejecting VICI's argument that section 11.2 is a liquidated damages clause, the reasoning is problematic. We have already rejected the Court's characterization of section 11.2 as a "quasi-liquidated damages" clause. *See supra* note 12. Additionally, the Court's analysis misapplied three distinct legal concepts: (1) the duty to mitigate; (2) penalty; and (3) windfall.

The District Court committed two legal errors in its mitigation analysis. First, it improperly placed the burden on VICI to present evidence that it took reasonable efforts to mitigate its losses. As discussed *supra* Part VII.B.1, the party asserting a limitation on a damages award bears the burden of proof. Second, the Court erred when it conducted a mitigation analysis in the first place—for T-Mobile waived that basis for reducing damages by not pleading it as an affirmative defense. As discussed *supra* Part VII.B.2, the failure to mitigate is an affirmative defense, and an affirmative defense that is not pled is waived, *Abdi v. NVR, Inc.*, 945 A.2d 1167 n.6 (Del. 2008).

The District Court also erred when it stated that awarding damages for the 2011 payment would render the award a penalty. We have not found any case under Delaware law applying the concept of a penalty outside the liquidated-damages context. Since we hold that section 11.2 is not a liquidated damages clause, any award that may be granted as a result of T-Mobile's failure to make the 2011 payment is not a penalty. *See PSL Air Lease Corp.*, 1974 WL 173050, at \*2-3 (declining to address defendant's argument that the purported liquidated damages clause would operate as a penalty after holding that the clause was not a liquidated damages clause).

Finally, the District Court did not properly support its conclusion that awarding the second $7 million would result in an unfair windfall. Delaware courts use the term "windfall" to describe any damage amount in excess of a party's expectation interest.

*See Paul v. Deloitte & Touche, LLP*, 974 A.2d at 146-47 (denying damages to terminated employee because doing so would award him double compensation); *Henkel Corp. v. Innovative Brands Holdings, LLC*, Case No. 3663-VCN, 2013 WL 396245, at \*5-6 (Del. Ch. Jan. 31, 2013) (denying plaintiff recovery for both the difference in sale price between time of breach and time of eventual sale and lost income because doing so would put plaintiff in better position than it would have been had the contract been performed); *Council of Unit Owners of Sea Colony E. v. Carl M. Freeman Assocs., Inc.*, 564 A.2d 357, 362-63 (Del. Super. Ct. 1989) (holding that cost of repair was the correct measure of damages for breach of construction contract and did not constitute windfall even though the full cost of repair would extend the useful life of the buildings beyond the amount reasonably anticipated at the time of contract).

Other jurisdictions maintain a similar concept of windfall. In *Ed Miller & Sons, Inc. v. Earl*, the Supreme Court of Nebraska considered an appeal from a trial court judgment in favor of a lessor for unpaid rent and the projected cost of repairing a parking lot. 502 N.W.2d 444, 450 (Neb. 1993). The Court held that the repair cost of the parking lot, rather than the diminished value, was the correct measure of damages. It noted that the repair costs provided a reasonably accurate measure and would not constitute a windfall to the lessor. *Id.* at 451.

Similarly, in *Old Stone Corp. v. United States*, the United States Court of Claims discussed windfall in an opinion following a trial on damages. 63 Fed. Cl. 65, 96 (2004), *aff'd in part*, *rev'd in part*, 450 F.3d 1360 (Fed. Cir. 2006). It considered whether restitution would be the proper measure of damages. In particular, the Court noted that the relevant question regarding windfall "is whether an award of restitution would place the [plaintiff] in an overall better position than if the breach of contract had not occurred." *Id.* (quoting *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1317 (Fed. Cir. 2004)).

Here, the District Court determined that, because VICI did not present evidence of its efforts to mitigate its damages, awarding $7 million based on the 2011 payment would either constitute an unfair windfall or a penalty. The only reasons the Court gave for this conclusion were based on (1) a misapplication of mitigation principles and (2) an erroneous substitution of liquidated-damages principles where no liquidated damages provision existed. The Court reached this conclusion without finding—either explicitly or implicitly—what losses VICI incurred or what costs it avoided as a result of the breach. To find a windfall, the District Court must find that VICI's requested damages exceed its expectation interest. Accordingly, the District Court erred in calculating VICI's

expectation damages for the 2011 period. For these reasons, we vacate the District Court's ruling on VICI's cross appeal.

On remand, the District Court is to consider, in the first instance, upon applying the appropriate burden of proof, whether to award VICI the additional $7 million or a lesser sum based on a proper measure of expectation damages, including the deduction of actual costs avoided. *See Savarese v. Agriss*, 883 F.2d 1194, 1210 (3d Cir. 1989) (vacating a damages award based on erroneous application of Pennsylvania law). The Court shall not consider any evidence or argument that VICI failed to mitigate damages, in view of our holding that T-Mobile waived this issue.

## IX.    Conclusion

The District Court's award of $7 million is affirmed. Its decision regarding VICI's damages resulting from T-Mobile's failure to make the 2011 payment is vacated. The case is hereby remanded to reconsider the 2011 damages issue in light of this opinion. On remand, the District Court should also consider the proper award of attorney's fees to VICI in light of its reassessment of the 2011 damages issue. Should there be any further appeals in this matter, they should be referred to this panel.