**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 22-2723, 23-1034
_____

*BRIAN J. CAMPBELL, as Administrator of the Estate of Joseph P. Campbell
*(Amended per Clerk's Order dated 02/29/2024)

v.

BOARD OF DIRECTORS OF BRYN MAWR TRUST COMPANY;
BRITTON H. MURDOCH, CHAIRMAN; ANDREA F. GILBERT, DIRECTOR;
WENDELL F. HOLLAND, DIRECTOR; SCOTT M. JENKINS, DIRECTOR;
DIEGO F. CALDERIN, DIRECTOR; FRANCIS J. LETO, DIRECTOR;
LYNN B. MCKEE, DIRECTOR; MICHAEL J. CLEMENT, DIRECTOR;
A. JOHN MAY, DIRECTOR; KEVIN TYLUS, DIRECTOR;
ROYAL BANK SUPPLEMENT EXECUTIVE RETIREMENT PLAN


ROYAL BANK SUPPLEMENT EXECUTIVE RETIREMENT PLAN,
Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(No. 2-19-cv-00798)
U.S. District Judge:  Hon. Joel H. Slomsky
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
September 30, 2024
_____

Before:  SHWARTZ, MATEY, and SCIRICA, Circuit Judges.

(Filed: October 3, 2024)
_____

OPINION[*]
_____

SHWARTZ, Circuit Judge.

The Royal Bank Supplemental Executive Retirement Plan (the "Plan") appeals the

District Court's orders (1) entering judgment in favor of one of its participants, Joseph

Campbell, on his claim for additional Plan benefits; and (2) awarding Campbell

attorneys' fees, interest, and costs. For the following reasons, we will affirm.

I

Campbell, a former executive of Royal Bank of America, participated in the Plan,

which provided "deferred . . . supplemental executive retirement benefits" for "a limited

group of key management or highly compensated employees[.]"[1] App. 1325. The Plan

allowed Royal Bank to create a "Rabbi Trust,"[2] into which Royal Bank deposited cash

---

[*] This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] "[E]xecutive deferred compensation plan[s]" are "commonly referred to as 'top hat' plan[s]." Kemmerer v. ICI Americas Inc., 70 F.3d 281, 284 (3d Cir. 1995); see also 29 U.S.C. § 1051(2) (defining a top-hat plan as "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees"). The assets used to pay this deferred compensation belong to the employer until paid to the employee, and the employee is not taxed on the benefit until he receives it because he "may never receive the money if the company becomes insolvent." In re IT Grp., Inc., 448 F.3d 661, 665 (3d Cir. 2006) (internal quotation marks and citation omitted). Campbell received an annual benefit under the plan of $347,000 from 2010 through 2017.

[2] A Rabbi Trust is
     an irrevocable trust for deferred compensation . . . [that] gives employees
     some measure of security, while at the same time deferring taxes. The assets
     set aside in the trust are segregated from the employer's other assets and can
     be used only to pay the deferred compensation. If there is a change in control

2

each month in an amount equal to the monthly benefit payments owed to Plan participants, while preserving the Plan's unfunded status under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq., and the advantages that come with that designation. In re IT Grp., Inc., 448 F.3d 661, 665 (3d Cir. 2006).

Royal Bank announced its merger with Bryn Mawr Trust Company and, upon taking control, Bryn Mawr terminated the Plan.[3] The Plan provides that if it is terminated after a change of control, "the Bank may distribute benefits under the Plan, to the Participants, in a lump sum subject to the above terms." App. 1336-37 (Section 9.7). The "above terms" include that:

> if at the time of a [c]hange of [c]ontrol occurs, the Bank had established a [Rabbi] trust . . . the Bank shall be required to transfer cash and/or other assets to said trust in an amount equal to the discounted present value of all of the future benefits payable hereunder to each Participant . . . . The discount rate shall be the 5-Year United States Treasury Note rate [("the Treasury Rate")] as published on the first day of the month immediately preceding the date on which the determination is made, compounded annually.

---

of the company, the new owners cannot take back the assets of the trust. The employee is not taxed until receipt of benefits as long as the trust funds are subject to the claims of the employer's creditors.

In re IT Grp., Inc., 448 F.3d at 665 (internal quotation marks and citation omitted). Here, the Rabbi Trust was established under the Royal Bancshares of Pennsylvania Inc. Rabbi Trust Agreement for the Supplemental Executive Retirement Plan (the "Rabbi Trust Agreement").

[3] As Royal Bank's successor, Bryn Mawr Board assumed responsibility for the Plan and, under Section 9.1 of the Plan, granted the Bryn Mawr Board,

the authority, subject to the terms of the Plan, to construe the provisions of the Plan and to adopt rules and regulations and make all determinations necessary or advisable for the administration of the Plan. The Board shall make all determinations as to rights to benefits under the Plan.

App. 1334-35. Under Section 9.3 of the Plan, "[t]he interpretation and construction of the Plan by the Board, and any action taken hereunder, shall be binding and conclusive upon all parties in interest." App. 1335.

App. 1332-33[4] (Section 6.2).[5]

Royal Bank's Chief Financial Officer, Michael Thompson, hired a consulting firm to determine the total amount due to all Plan participants using the Treasury Rate, as compared to using a so-called Citi Pension Liability Index Rate (the "Citi Rate").[6] The consultant's reports (the "Reports") revealed that use of the Citi Rate would result in a $15 million payment to participants, while the Treasury Rate would result in an $18 million payment. The Bryn Mawr Board of Directors used the Citi Rate to calculate the lump-sum benefit payments, which rate would result in a lower payment to the participants.

Campbell received his $3,924,910 lump-sum payment and thereafter submitted a claim to the Bryn Mawr Board, asserting that it should have used the Treasury Rate to calculate his lump-sum payment and, using that rate, he was entitled to an additional $368,650.47. The Bryn Mawr Board formed a three-person committee (the "Committee") to review the claim. In a memorandum to the Committee, Thompson, now employed by Bryn Mawr, advocated for use of the Citi Rate because (1) it was the

---

[4] Additionally, Section 1(f) of the Rabbi Trust Agreement provides that:
[u]pon a Change of Control, as defined in the Plan, Bank shall . . . make an irrevocable contribution, if not already made, to the Trust in an amount that is sufficient to pay each plan participant or beneficiary the benefits to which plan participants or their beneficiaries would be entitled pursuant to the terms of the Plan as of the date on which the Change of Control occurred.
App. 882.

[5] Unlike Section 6.2, Section 9.7 does not specify a discount rate.

[6] The Citi Rate is based on a hypothetical portfolio of double-A rated corporate bonds of varying durations. Royal Bank used the Citi Rate to calculate the Plan's liabilities for tax reporting purposes.

"Actuarial Equivalent"[7] of the rate used to value the Plan's liabilities on Royal Bank's financial statements, (2) the Plan required Bryn Mawr to use an actuarially equivalent discount rate in calculating the distributions (even though Section 9.7 nowhere mentions "Actuarial Equivalent"), and (3) the Treasury Rate only applied for Section 6.2 funding purposes in the event the Plan continued to exist following a merger. Thompson did not provide the Committee with the Reports or the Rabbi Trust Agreement, and his memorandum did not mention the Rabbi Trust.

The Committee denied Campbell's claim for two reasons. First, it reasoned that "[Section] 6.2 . . . only covers Rabbi Trust funding[] [and] does not provide the discount rate to be used for calculating lump sum distributions in the event of a termination of the [Plan] under [Section] 9.7(a)[,]" App. 1450. Second, it explained that Section 2.2 "provides the appropriate discount for calculating lump sum distributions upon the termination of the [Plan]" and that calculations under Section 9.7 (which directs lump-sum payments to participants if the Plan is terminated after a change of control) "are 'Actuarial Equivalent' calculations -- that is, [] Campbell's lump sum under the [Plan] represents the actuarial equivalent of his annuity stream under the [Plan,]" App. 1451-52.

---

[7] The Plan defines "Actuarial Equivalent" to mean:
with respect to a given benefit, any other benefit provided under the terms of the Plan which has the same present or equivalent value on the date the given benefit payment commences, based on the use of actuarial equivalent factors adopted by [Royal] Bank and being used to value the Plan liabilities at the time of the calculation.
App. 1325 (Section 2.2.).

The Committee therefore concluded that the Citi Rate is the Actuarial Equivalent discount rate, and thus Campbell received the correct benefit.[8]

Campbell appealed the Committee's decision to the full Bryn Mawr Board. At the meeting to consider Campbell's appeal, the Bryn Mawr Board was: (1) incorrectly advised that Royal Bank never funded a Rabbi Trust;[9] (2) informed that if the Treasury Rate applied, Campbell would receive an additional $368,650.47; and (3) told that the more costly Treasury Rate could apply to all twenty-six Plan participants. The Bryn Mawr Board did not verify that Thompson provided it with all relevant documents or seek guidance from members of Royal Bank's board or attorneys on the meaning of the Plan's terms. Ultimately, the Bryn Mawr Board denied Campbell's appeal for substantially the same reasons given by the Committee.

Campbell sued, and during discovery, the Plan produced the Rabbi Trust Agreement to him for the first time. Following a bench trial, the District Court entered judgment in Campbell's favor, see Campbell v. Royal Bank Supplemental Exec. Ret. Plan, 625 F. Supp. 3d 387, 400 (E.D. Pa. 2022) ("Dist. Ct. Op."), and awarded him fees, interest, and costs, Campbell v. Royal Bank Supplemental Exec. Ret. Plan, 646 F. Supp. 3d 629, 650 (E.D. Pa. 2022). The Court determined that even if it owed deference to the

---

[8] Additionally, the Committee did not "speak with anyone from Royal Bank [to discern] the intended meaning of [the Plan]" or with "the former counsel that had prepared the [Plan.]" App. 1248.

[9] The Rabbi Trust was in fact funded each month so that payments could be distributed to Plan participants. Thompson also wrongly suggested that Section 1(f) of Rabbi Trust Agreement provides that its terms apply only "should the [Plan] continue to exist[.]" App. 1462. Section 1(f) contains no such limiting language.

6

Bryn Mawr Board's construction of the Plan under <u>Goldstein v. Johnson & Johnson</u>, 251 F.3d 433 (3d Cir. 2001), the Bryn Mawr Board unreasonably interpreted the Plan and acted in bad faith. <u>See</u> Dist. Ct. Op. at 424-28. The Plan appeals.

II[10]

We review an administrator's decision interpreting a top hat plan "de novo, according to the federal common law of contract." <u>Goldstein</u>, 251 F.3d at 443 (citation omitted). "Ordinary contract principles require that, where one party is granted discretion under the terms of the contract, that discretion must be exercised in good faith—a requirement that includes the duty to exercise the discretion reasonably." <u>Id.</u> at 444 (citations omitted). Here, the Plan grants its administrator discretion to construe its provisions "subject to terms of the Plan[.]" App. 1334. Under this Court's deferential standard in Goldstein, we thus ask whether the Plan administrator's actions are "reasonable and it exercise[d] its responsibilities in good faith." 251 F.3d at 444.[11]

---

[10] "On appeal from a bench trial, [we] review[] a district court's findings of fact for clear error and its conclusions of law de novo." <u>VICI Racing, LLC v. T–Mobile USA, Inc.</u>, 763 F.3d 273, 282–83 (3d Cir. 2014) (citation omitted). We review a district court's finding of bad faith for clear error. <u>See</u> <u>Goldstein</u>, 251 F.3d at 436. "A finding of fact is clearly erroneous when it is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." <u>VICI Racing, LLC</u>, 763 F.3d at 283 (internal quotation marks and citation omitted).

[11] The District Court held the Plan's terms do not warrant <u>Goldstein</u> deference and applied *de novo* review. **Dist. Ct. Op. at 411.** However, we do not and need not address that issue here. Even under <u>Goldstein</u>'s deferential standard, the Plan administrator did not reasonably exercise its responsibilities in good faith. <u>See</u> <u>Goldstein</u>, 251 F.3d at 444. Accordingly, we affirm the District Court.

The plain language of the Plan shows that use of the Citi Rate in issuing Campbell's lump-sum payment was unreasonable. Section 6.2 expressly provides that if Royal Bank had a Rabbi Trust set up at the time of a change of control, the company was "required to transfer cash . . . to said account in an amount equal to the discounted present value of all of the future benefits payable hereunder to each Participant[,]" using the Treasury Rate.[12] App. 1132-33. Here, the Rabbi Trust existed at the time of the merger and the merger caused a change of control. As a result, the Plan required the transfer of money sufficient to pay the beneficiaries, and this amount was calculated under Section 6.2. See Kemmerer v. ICI Americas Inc., 70 F.3d 281, 289 (3d Cir. 1995) (observing that a plan administer must unambiguously follow a plan's provisions as written).

Section 9.7 does not disturb this requirement. That section provides that "if the Bank terminates the Plan" within various deadlines, all of which are satisfied here, then "the Bank may distribute benefits under the Plan, to the Participants, in a lump sum subject to the above terms." App. 1336-37. Thus, this provision directs a lump sum distribution and, while it does not specify any discount rate,[13] it instructs that the distribution is subject to "the above terms." App. 1337. One such term is set forth in

---

[12] Section 6.2, by its plain terms, applies irrespective of whether the Plan was to be terminated after a change of control.

[13] Tellingly, other sections of the Plan expressly call for use of the Actuarial Equivalent—but not Section 9.7. See, e.g., App. 1330 (providing that "[i]f a Participant is continually employed by the Bank until his or her Early Retirement Date, he or she shall be entitled to receive an early retirement benefit equal to the Actuarial Equivalent amount of his or her Accrued Benefit"). Had the Plan wanted to apply the Actuarial Equivalent to the lump sum benefit calculation, it could have said so.

8

Section 6.2, which identifies the Treasury Rate to determine the amount to fund the Rabbi Trust.

The Plan asserts that Section 6.2 applies to funding the Rabbi Trust but not to issuing payments. Under that view, Royal Bank would use the Treasury Rate to determine the amount to fund the Rabbi Trust but would use the Citi Rate to arrive at the figure to pay Participants. This approach is nonsensical, as the Rabbi Trust served as a pass-through account to issue benefits. As Thompson explained, money that went in swiftly thereafter went out. The terms of the Rabbi Trust Agreement further confirms that Section 6.2 does not contemplate overfunding the Rabbi Trust following a change of control, as it provides that, following a change of control, the Bank was to fund "the Trust in an amount [] sufficient to pay each plan participant"—not more than necessary. App. 882. Thus, the amount funded, after applying the Treasury Rate discount, was the amount to be paid the participant.

Furthermore, to interpret Section 9.7 to require using the Citi Rate would render Section 6.2's specific use of the Treasury Rate meaningless and thus contravene the canon against superfluity. See Pacific Emps. Ins. Co. v. Glob. Reinsurance Corp. of Am., 693 F.3d 417, 430 (3d Cir. 2012) (observing that courts should not construe contracts in a way that would render provisions meaningless). Additionally, construing the phrase "subject to the above terms" to apply only to the terms of Section 9.7, rather than the full Plan (including Section 6.2), would render that language meaningless, as Section 9.7 provides no clarity as to how to calculate the lump sums.

9

Thus, using the Citi Rate to calculate Campbell's lump sum distribution was not reasonable under the Plan's terms.

Additionally, the District Court did not commit clear error in finding that the Bryn Mawr Board acted in bad faith. The record reflects that (1) Thompson provided the Committee neither the Rabbi Trust Agreement nor the Reports; (2) Thompson's memorandum to the Committee did not mention the Rabbi Trust; (3) Thompson's memorandum to the Bryn Mawr Board wrongly represented that "Royal [Bank] . . . never funded the Rabbi Trust at all[,]" App. 1462; (4) neither the Bryn Mawr Board nor the Committee verified that Thompson provided all relevant documents or sought guidance from any members of the Royal Bank's prior board or attorneys on the meaning of the Plan's terms; and (5) Bryn Mawr did not provide Campbell with a copy of the Rabbi Trust Agreement until after he sued. Taken together, the District Court had a basis to conclude that the Bryn Mawr Board acted in bad faith.[14]

Accordingly, the District Court correctly entered judgment in Campbell's favor and acted within its discretion in awarding him attorneys' fees, interest, and costs. See 29 U.S.C. § 1132(g)(1).

III

For the foregoing reasons, we will affirm.

---

[14] The Plan does not argue that Thompson's conduct cannot be imputed upon it.

10